STATE OF MAINE

KNOX, ss.

STATE OF MAINE
Knox. S.S., Clerks Office
SUPERIOR COURT

JUN 28 2004

RECEIVED AND FILED
Susan Guillette, Clerk

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. RE-03-001
JRA – KNO – 6/28/04

ROBERT S. KEEFER, JR.,

   Plaintiff

  v.

JOHN W. KEEFER,

   Defendant

DECISION AND ORDER

DONE
LA

JUL 7 2004

This matter is before the court on two motions: a motion to amend filed by plaintiff Robert S. Keefer, Jr. and a motion for summary judgment filed by defendant John W. Keefer. The motions have been briefed, argued and are in order for disposition.

I. **Motion to Amend.**

By this motion Robert S. Keefer, Jr. (Junior) seeks to add the estate of his father Robert S. Keefer, Sr. (Senior) as a party plaintiff. Junior is the personal representative of his father's estate. As the vehicle to accomplish this end he has styled his motion as a motion to amend and has submitted an amended complaint which simply adds himself as a plaintiff but in the additional capacity as the personal representative of his father's estate.

The defendant objects to this request because the scheduling order in this case provides that "unless otherwise ordered by the court, new parties may not be joined . . . and motions to amend the pleadings may not be filed later than 4 months from the date of this order." Because this order was made on February 26, 2003, the defendant argues that the time limit within which an amendment might be made, or a new party added,

expired on June 26, 2003. Thus, he says, the motion to amend, which was filed on July 22, 2003, is too late and must be denied.

The stated reason for the proposed amendment to add Senior's estate as a party was that Junior wanted to spare his father, a man of 98 years, the aggravation and emotional turmoil of litigation and, therefore, did not include him in the original complaint. Upon his death on May 10, 1993, that changed and his father's estate could be added to the case.

Moreover, the plaintiff states that if he is correct that the defendant, John W. Keefer (John), held the property in Camden, the ownership of which is in dispute in this case, as the nominee of Senior, John's grandfather, then Junior as the personal representative of Senior's estate has the obligation to pursue this claim for the estate.[1]

John replies that there was enough time from Senior's death to the expiration of the time period provided to amend or add parties and Junior could and should have acted in the time frames cited in the order. Moreover, to add Senior's estate now would be prejudicial because Senior is no longer available to be deposed.

The defendant's assertions as to the plaintiff's failure to add a party or to amend the compliant within the time specified in the scheduling order have merit. Nevertheless, the court will grant the motion as the order specifically authorizes the court to except a party from this time limit; that is, the time limit applies "unless otherwise ordered." As importantly, the exception is warranted here because the amended complaint is essentially the same as the original complaint. That being so, the defendant should not be prejudiced by the addition of a party to the original pleading. Moreover, as M.R. Civ. P. 15 provides, leave to amend a complaint "shall be freely

---

[1] Senior was the father of Junior and Junior is the father of John, so Senior was John's grandfather.

given when justice so requires." "Freely given" has been interpreted to mean that an amendment should be allowed:

> In the absence of any apparent or declared reason — such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, futility of amendment, etc. . . .

*Bangor Motor Co. v. Chapman*, 452 A.2d 389, 392 (1982) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

None of these factors are cited by the defendant as a reason to deny the plaintiff's amendment except the claimed prejudice that Senior is no longer available to be deposed. In this regard, it should be noted that it appears evident from the parties' submissions on this motion, the pending motion for summary judgment, and the text of the original complaint that Senior was an important player in the transactions which form the basis of the parties' dispute. Thus, it can reasonably be concluded that John and his counsel must have understood the importance of deposing Senior whether or not he was a party especially given his advanced age. By these same submissions, it is also apparent that Senior would be an important witness for either side in this case and the prejudice of his unavailability affects both parties.

Also, adding Senior's estate as a party serves the interests of justice. If he were not added, it appears that summary judgment would likely be entered against Junior on one count and an examination of the propriety of John's claim to the property in question would not be fully addressed. As well, if Senior's estate were not added to this case, and summary judgment were entered against Junior, the case may be restarted with Senior's estate as the party plaintiff. Such a situation would entail additional expense to all and a waste of judicial resources. Instead, by adding Senior's estate as a party, the merits of this dispute may be fully addressed and the result will

finally resolve the competing interests in the property at issue. In the court's view, this approach is consistent with Rule 15's authorization of an amended pleading "when justice so requires."

Finally, adding Junior in his capacity as his father's estate's executor is consistent with M.R. Civ. P. 19(a) and 20 which contemplate adding parties in order to achieve a disposition of claims common to all parties and to provide complete relief among them.

For all these reasons, then, the motion to amend is to be granted.

## II. Motion for Summary Judgment.

### A. Undisputed Facts.

By this motion, the defendant, John, seeks judgment entered in his favor on the entirety of the complaint and/or the amended complaint brought by Junior personally or in his capacity as the personal representative of Senior's estate. In this regard, it is worth observing that in preparation of this motion, John's counsel apparently anticipated that the motion to amend might be granted so addressed the motion to the entirety of the case, whatever status Junior might have as a party. Further, as John has argued, Junior has presented no argument in his reply to the motion that summary judgment is not to be entered against him in his personal capacity, at least as to count I of the amended complaint. Thus, the court will grant the motion as to Junior in this capacity and endeavor to address the motion as it relates to him in his capacity as personal representative of Senior's estate.

As is well understood in Maine law, summary judgment may be entered if there is no genuine issue as to any material fact and that a party is entitled to judgment as a matter of law on those facts. M.R. Civ. P. 56(c). Accordingly, the court is required to review the factual submissions of the parties in order to determine whether the movant

is entitled to a judgment in his favor on the material facts not in dispute. The court has done so, and finds that it may make the following findings:

As noted herein, Senior was the father of Junior who is the father of John; accordingly Senior was John's grandfather. Junior was married to Dee Mattox (Mattox) after being divorced from John's mother. Junior moved to California and purchased a residence in Malibu, transferring title to this property to Mattox in 1977.

By the mid-1990's, Junior had become insolvent and was being pursued by business creditors and the IRS.

Junior became involved in a divorce proceeding with Mattox and, at the time, Senior had acquired several mortgages on Mattox's Malibu property from creditors. Senior supported Junior's efforts to obtain the divorce and cooperated with him. They decided to use the mortgages as leverage to force an acceptable resolution of the divorce. At Senior's direction and with Junior's consent, J. Thomas Cairns (Cairns), Senior's attorney, arranged to foreclose the mortgages Senior held on the Malibu property. On February 20, 1996, Mattox and Senior entered into a settlement agreement to settle all claims of Senior with respect to Mattox. This agreement was concurrent with the separate divorce settlement between Mattox and Junior. Pursuant to the settlement agreement between Mattox and Senior, it was agreed that Mattox would convey the Malibu property to Senior or his nominee in return for Senior ensuring that Junior would pay Mattox $140,000 pursuant to the divorce settlement agreement. Also on February 20, 1996, Mattox executed a deed conveying the Malibu property to John. Before this occurred, Senior spoke with John and his brother, Robby, and told them he wanted to have Mattox transfer the property to both grandsons in order to keep the property in the Keefer family. Robby decided not to take title to the Malibu property with John.

Initially, Senior was going to take title to the Malibu property in his own name.[2] During this time Senior was concerned about Junior's financial issues, including creditor problems and problems with the IRS. Junior filed for Chapter 7 bankruptcy in the Fall of 1997. For these reasons, Senior did not want to transfer the Malibu property to Junior. There was considerable discussion among Senior, Junior and Cairns about how to deal with Junior's financial problems and an IRS lien which had been filed on Senior's property in Florida.[3] After expressing concerns that he be protected from liabilities, John agreed to take title to the Malibu property. John was to be given funds by Senior in order to cover costs and maintenance related to the property as well as for keeping the property in the Keefer family.

Senior always treated his grandsons equally; if he made a gift to one, he made the same gift or one of comparable value to the other. He never made a gift of comparable value of the Malibu home to Robby nor did he make any additional provision for him in either his will or his trust. When Senior amended his living trust, he always made the same provision or lack thereof for each of Junior's sons. John did not have any type of control or unusual influence over Senior. Senior had given John and Robby annual gifts and they had visited him during April vacations at his home.

---

[2] Defendant has denied this "fact" in his response to plaintiff's statement of material facts because he claims such a fact would have to be based on inadmissible hearsay. At this juncture, on this limited record, the court believes that M.R. Evid. 803(3) may apply and will therefore consider this fact as admissible evidence for purposes of action on this motion without prejudice to later argument on its admissibility. A motion in limine is pending which addresses the admissibility of statements Senior may have made about his plans and intentions. At oral argument on these motions, counsel advised that ruling on this motion could be deferred.

[3] *See* footnote 2, *supra*. Apparently the lien on Senior's property was a mistake as Senior's and Junior's name is the same. *See* Affidavit of Robert S. Keefer, Jr., ¶ 16.

Junior enjoyed a close relationship with Senior. Senior never informed Junior that he had gifted the Malibu property to John.[4] Senior was a very astute businessman who had developed substantial wealth over his lifetime by investing shrewdly.

Neither Senior nor Junior recorded a future interest in the Malibu property in the appropriate Registry of Deeds.

On January 27, 1997, Junior executed and recorded a quitclaim deed which released any interest he had in the Malibu property.[5] Junior lived at the Malibu property thereafter on an occasional basis. John also lived there before and after the transfer of the property to him, but moved out to live with his girlfriend.

In April of 2000, John exchanged the Malibu property for property located in Camden, Maine, through a like-kind exchange. The deed for the Camden property reflects that John owns 89.27% of the title and Junior owns 10.73 percent. At all times pertinent to this dispute, John was the titleholder of the Malibu property and the holder of a majority interest in the Camden property. At the time the Malibu property was exchanged for the Camden property, Junior had no claim to the Malibu property.

Senior died on May 10, 2003. Junior managed Senior's affairs, including his financial affairs, for a time before his death. Also, Junior arranged for his housekeeper, Gigi Beasley (Gigi), to go to Florida to live with Senior and serve as his "administrative assistant." She also provided Senior his day-to-day medical and domestic care.

Michael Starler (Starler), Junior's tax attorney, spoke with John a number of times between February 2, 1999, and January 22, 2003, about the Malibu property and, later,

---

[4] Defendant appears to object to this "fact" as hearsay. *See* Defendant's Response to Plaintiff's Statement of Additional Facts, ¶ 74. The absence of a statement does not fit the definition of hearsay. M.R. Evid. 801(a), (c).

[5] This is one of several facts in the defendant's statement of undisputed material facts which shows that Junior had no personal, legal interest in the Malibu property. Because it is apparent that he no longer is asserting any personal interest in the property, the court has omitted other "facts" which demonstrate this circumstance. *See, e.g.,* Defendant's Statement of Material Facts, ¶¶ 30, 39-40, 50.

about the property in Camden, Maine, which is the subject of this litigation. On several occasions, John told Starler that he was not the beneficial owner of the Malibu property. The only reason that John gave for not immediately transferring record ownership of the property in Camden, Maine, to his father was a concern about the tax consequences of such a transfer.[6]

To qualify as a deferred like-kind exchange, John had to take title to the Camden property to the extent that the proceeds for the Malibu property were used for its acquisition. Starler performed this calculation and advised James G. Elliott, the attorney handling the closing for the Camden property, that John should be deeded an undivided 89.27% interest and Bob an undivided 10.73% interest.

Junior gave John two checks for $10,000 each in 2001.[7]

B.      Disputed Facts.

What follows is a recitation of the "facts" which are in dispute according to the parties' submissions on this motion:

The defendant claims that when he took title to the Malibu property, Senior attached no conditions to the transfer; Senior simply wanted the property to be kept separate from Junior's financial problems but remain in the Keefer family with John as the owner. Senior never stated that he wanted the Malibu property held by John for the benefit of Junior. Prior to the last three years of Senior's life, John never received any type of communication from Senior that the property had been transferred to him by Mattox with the intent of it being held for Senior or anyone else.

Junior disputes these assertions and states that he and Senior decided that John would serve as Senior's agent or nominee to hold title to the Malibu property. Senior

---

[6] Although the defendant has denied the "facts" in this paragraph, his record references do not contradict this statement of facts; accordingly they must be deemed admitted. M.R. Civ. P. 56(h)(4).

[7] See footnote 6, supra.

told his attorney that John was merely to hold record title to the Malibu property and that Senior would retain beneficial ownership of this property. He did not intend to give the Malibu property to John. Senior wanted Junior to ultimately have the Malibu property when he had resolved his creditor problems. According to Cairns, Senior's attorney, John was present when he and Junior discussed the arrangements for the Malibu property so would know from his presence and participation in these meetings that his role was to hold title as Senior's agent. Previously, John has acknowledged that he was only serving as nominee for Senior.

John denies ever receiving instructions from Senior as to what to do with the Malibu property, that is, either to sell it or transfer it to Junior.

John claims that in the three years prior to his death that Senior was dependent on Junior for care. During this time, Junior exerted substantial pressure on Senior to convince him to pressure John into transferring his interest in the Malibu property to Junior. Gigi assisted Junior with this and drafted letters at Junior's direction for Senior's signature directing John to convey the Camden property to Junior. She also screened calls from John and Robby to their grandfather.

Junior denies the claim that Senior was dependent upon him for day-to-day care and that his girlfriend, Uta Patino, as opposed to Gigi, provided Senior this care. He also denies exerting pressure on Senior to convince him to pressure John to transfer the Camden property to him or that Gigi assisted him in such an effort. Junior further denies that he instructed Gigi to send letters to John or that he dictated any letters to John which bore Senior's signature and directed John to convey the Camden property to Junior. Gigi acknowledges answering Senior's phone but states that she did not impede his grandsons from speaking with him on the phone or with communicating with him in any other way.

Junior claims that Starler, his tax attorney, spoke with John who complained that he had not been compensated for holding title to the Malibu property which was to be in the form of two $10,000 payments – one on taking title, the second when the property sold. Starler advises that he reported this conversation to Junior. Junior states that he subsequently paid John in two installments.

John denies having this conversation with Starler.

C.   **Discussion.**

Junior has expressed his amended complaint in two counts: in count I he asks the court to impose a constructive trust on the Camden property and order it conveyed to him or to Senior's estate. In count II, Junior asks for a declaratory judgment that John is holding the property as nominee for Senior and order him to convey it to Junior or Senior's estate.

John asks for summary judgment on these two claims and provides four arguments in support of his quest to have this case resolved in his favor as a matter of law.

In his first argument, John says that California law prohibits Junior from asserting an ownership in the subject property in behalf of himself or his father's estate. This is because if either Junior or Senior had a future interest in the Malibu property, California law required them to record that interest within five years and the failure to do so would cause such a property right to expire. Thus, John advises, because the transfer of the Malibu property to him occurred on February 20, 1996, it is now too late to record, and therefore enforce, a future interest in this property.

The plaintiff offers a variety of arguments to refute this contention. The first of these, in which the court concurs, is that the California statute, the Marketable Record Title Act, Cal. Civ. Code § 880.020 *et seq.*, requires the recordation of a future interest

which is characterized as a "right of entry" when it is attached to a fee simple subject to a condition subsequent or a "possibility of reverter." *Severns v. Union Pacific Railroad Co.,* 101 Cal. App.4th 1209, 1219, n.6 (2002). These definitions of future interests are termed powers of termination and bear similar statutory definitions as those noted in the case cited. Cal. Civ. Code § 885.010(a)(1), (2).

Simply stated, such future interests are enforceable upon the occurrence of some act or event in the future. Senior's interest in the Malibu property is not, in the court's view, a future one that is so contingent. He agreed with Mattox, and provided her consideration, to have her convey the property on which he could foreclose mortgages to his nominee, namely someone:

> [d]esignated to act for another as his representative in a rather limited sense. It is used sometimes to signify an agent or trustee. It has no connotation, however, other than that of acting for another, in representation of another, or as the grantee of another.

BLACK'S LAW DICTIONARY, 5th ed. (1979), quoting *Schuh Trading Co. v. Commissioner of Internal Revenue,* C.C.A. Ill.; 95 F.2d 404, 411 (1938).

By California law, "nominee" connotes delegation of authority to that person in a representative or nominal capacity only, and does not entail the transfer or assignment to the nominee of any property in, or ownership of, the rights of the person appointing him. *Cisco v. Van Lew,* 141 P.2d 433, 438, 60 Cal. App.2d 575 (1943); *see also Camden Land Co. v. Lewis,* 101 Me. 78, 88, 63 A. 523, 527 (1905).

Thus, when John took the Malibu property as Senior's "nominee" as that term is here defined, he took it only as Senior's agent and the latter's interest was an ongoing, current one as opposed to a future or contingent interest. That being so, Senior's interest in the Malibu property does not fit the definition of "future interest" or "power

of termination" under the California case or statute cited which would require him to record that interest to preserve it.

Also, as the plaintiff suggests, no one has an interest in the Malibu property any longer and the dispute in this case concerns the parties' competing interests in Maine property to which California law does not apply. Accordingly, the alleged failure of Senior or Junior to record a potential future interest in the Malibu property is of no consequence in this case.

John's second argument is that he never held property for Junior at any time. As noted, *infra*, at footnote 5, it appears Junior had no interest in the Malibu property and offers no argument to oppose the assertion that John held no property for him, either in California or Maine. Accordingly, as has been recognized herein, summary judgment is to be entered against Junior on the amended complaint on count I.[8]

John's next argument is that the plaintiff cannot prove that there was a constructive trust for the benefit of Senior.

> A constructive trust may be imposed to do equity and to prevent unjust enrichment when title to property is acquired by fraud, duress, or undue influence, or is acquired or retained in violation of a fiduciary duty. The modern rule . . . does not require a party seeking a constructive trust to show affirmative wrongdoing. The constructive trust arises by operation of equity without regard to the parties' intentions. Its objective is to prevent unjust enrichment.

*Estate of Campbell*, 1997 ME 212, ¶ 5, 704 A.2d 329, 330-31 (quotations and internal citations omitted).

If the claim for a breach of a constructive trust is based on an abuse of a confidential relationship, the party seeking the imposition of the trust must establish:

---

[8] Granting this motion for John against Junior personally, however, does not affect Junior's percentage interest in the Camden property. It simply means that Junior has no basis to have the court impose a constructive trust on the Camden property via the theory that John held it for him pursuant to a fiduciary responsibility to him.

. . . the actual placing of trust and confidence in fact by one party in another and a great disparity of position and influence between the parties to the relation. That the parties are related by blood or marriage may lead a court to find that a confidential relation exists, where there is evidence as to trusting and where the blood or family relationship is in close degree so that the imposition of great trust and the letting down of all guards and bars is natural.

*Estate of Campbell, id.* ¶ 8, 704 A.2d at 331 (quoting *Ruebsamen v. Maddocks*, 340 A.2d 31, 35 (Me. 1975)).

However, "the fact that the parties are family members will not, without more, establish a confidential relationship." *Moulton v. Moulton*, 1998 ME 31, ¶ 5, 707 A.2d 74, 75-76.

A constructive trust may also be imposed on the basis of constructive fraud.

Constructive fraud occurs when the grantor transfers property to the grantee, who promises or agrees to hold the property for the benefit of the grantor or a third party, and the grantor is induced to act through reliance on a relationship of trust which may be founded in moral, social, or personal, as well as legal duties.

A constructive trust may be imposed on the basis of constructive fraud when there is clear and convincing evidence of an agreement between the grantor and the grantee to benefit another party.

*Baizley v. Baizley*, 1999 ME 115, ¶ 7, 8, 734 A.2d 1117, 1119.

When, as here, a defendant files a motion for summary judgment, the plaintiff bears the burden of making a prima facie showing of each element of his claim in order to defeat the motion. *Brawn v. Oral Surgery Associates*, 2003 ME 11, ¶ 15, 819 A.2d 1014, 1022-23. In reviewing this effort, however, the court is to view the evidence properly before the court in the light most favorable to the nonmovant. *See Machias Savings Bank v. Ramsdell*, 1997 ME 20, ¶ 10, 689 A.2d 595, 598-99.

In the court's view, on the undisputed facts and on those facts which are in dispute but which may be proven by the plaintiff at trial, he is able to establish, on this record, a prima facie case that there was a trust relationship between Senior and John

and that the latter breached that trust so that, in the end, Junior may be successful in having a constructive trust imposed. In reaching this conclusion, the court has, as it must, evaluated the evidence in the light most favorable to the plaintiff.

Thus, first, it appears that the plaintiff can prove that there was a confidential relationship between Senior and John. The two are related by blood and enjoyed a trusting relationship. The latter is demonstrated by Senior's solicitation of John to hold the Malibu property in order to keep it in the family and John's agreement to do so when his father appeared to be an inappropriate candidate for this job because of his issues with creditors, and when John's brother, Robby, declined to help. This left John, apparently, as the only intra-family candidate to hold the property which Senior could have taken as a mortgagee, or had transferred to Junior. But these options were not exercised apparently because of Junior's creditor problems and because of the similarity between his name and Junior's which had led to a lien being placed on Senior's property. Accordingly, it may be argued, Senior selected John and trusted him with this important family responsibility. Moreover, the record also shows that John and Senior had a good relationship as the former visited Senior on Spring vacations and the latter gave John and his brother annual gifts.

In the court's view, this evidence, which is either undisputed or demonstrated by the plaintiff's contested summary judgment submissions, is enough for purposes of action on this motion to establish a confidential relationship beyond a mere familial connection. Indeed, the relationship between John and Senior concerning the stewardship of the Malibu property also entailed Senior compensating John for holding the property, perhaps because they understood that he was the only family candidate agreeable to this arrangement or, as the parties have agreed, to be sure that the

properties' costs were met, that the property stayed within the family, and that John was not burdened with this responsibility.

The same analysis can be applied to the theory that a constructive trust may be applied based on constructive fraud. So, a factfinder may find in this case that Senior caused the Malibu property to be conveyed to John as his nominee to hold it for him or Junior and that he was induced to do so because of the relationship of trust, described *supra*, which existed between them.[9] So, a factfinder may find here that Senior caused the Malibu property to be conveyed to John as his nominee to be held for him or Junior and that he was induced to do so because of their trusting relationship.

As to either theory, the refusal of John to turn the property over to Junior as Senior's estate's personal representative or, earlier, to Junior as Senior had allegedly planned, may satisfy the need to establish a breach of the confidential relationship or the agreement between trusting parties so that a constructive trust may be imposed.

Further, as the plaintiff suggests in his memo, if the defendant was not Senior's agent and violated the trust of that relationship, the Malibu property must have been a gift to John. To overcome this claim, Junior would have to show that Senior lacked the donative intent inherent in such a conveyance. *Westleigh v. Congor*, 2000 ME 134, ¶ 7, 755 A.2d 518, 519. The undisputed facts, and those Junior relies on to contest the motion, would support a finding that Senior did not give his interest in the Malibu property to John. Examples of evidence in this record to support this conclusion are numerous, and need not be repeated here, but include, for example, John's alleged acknowledgement that he was simply serving as Senior's nominee in the real estate transactions at issue.

---

[9] That the burden of proof applicable to this theory is clear and convincing does not affect this analysis. It will be up to a factfinder to determine if the plaintiff meets this level of proof.

In sum, on this record of facts disputed and undisputed, the court concludes that Junior may be able to prove that a trust relationship existed between Senior and John so that its breach may be remedied via count I. Accordingly, summary judgment will not be entered on this count on this basis against Junior in his capacity as personal representative of his father's estate.

As his final argument in support of the motion, John says that the plaintiff is, in essence, asking the court to reform the deeds at issue in this case to include conditional provisions which would give Senior a future interest in the Malibu or Camden properties. The court may not reform the deeds, the defendant argues, because they are contracts which are to be interpreted in his favor as grantee and cannot be altered due to a unilateral mistake by the grantor. So, it is claimed, the court may not consider circumstances extrinsic to the deed to have it convey an interest not expressly included in the deed. Accordingly, because Senior arranged for the Malibu property to be conveyed to John with no conditions attached, the plaintiff cannot disprove the donative intent of this transaction and the deed to John is absolute.

As to this final argument, as noted *infra*, the record here shows that the plaintiff is able to establish that the conveyance of the Malibu property to John was not a gift, but was, instead, a transaction designed to place this property in the hands of a trusted family member until Senior might direct otherwise. It is for this reason, albeit briefly here expressed, that the plaintiff may prevail on his theory of breach of a constructive trust. In doing so, he need not ask for the deed to be reformed or require the same in order to have a trust imposed. This remedy would be judicially imposed and would not require proof of a mistake by the grantor, but, instead, a breach of a trust relationship which resulted in unjust enrichment to the defendant.

This argument, then, also fails to secure summary judgment for the defendant on count I.

## III.    Conclusion.

Based on the foregoing, the court finds that there are disputes of material fact in the record properly before the court and that this circumstance, taken with those facts that are agreed to, compel the court to conclude that the defendant is not entitled to judgment as a matter of law and the motion is to be denied.

The clerk is therefore DIRECTED to make the following entries:

Plaintiff's Motion for Leave to File Amended Complaint is GRANTED. If the defendant has not already done so, he shall answer the Amended Complaint within 14 days after the filing of this order.

Motion for Summary Judgment is GRANTED in part and DENIED in part. The motion is GRANTED as to Robert S. Keefer, Jr., plaintiff, in his personal capacity only on Count I of the Amended Complaint. It is DENIED in all other respects.

So ordered.

Dated: June___25___, 2004

John R. Atwood
Justice, Superior Court

ROBERT S KEEFER JR V. JOHN W KEEFER
UTN:AOCSsr  -2003-0011500                    CASE #:ROCSC-RE-2003-00001
------------------------------------------------------------------------------
SEL VD                                  REPRESENTATION TYPE      DATE
01 0000003232 ATTORNEY:PERKINS, DAVID
ADDR:30 MILK STREET PO BOX 449 PORTLAND ME 04112-0449
    F FOR:JOHN W KEEFER                        DEF          RTND   02/26/2003

02 0000000437 ATTORNEY:WATKINSON, RANDAL
ADDR:10 MASONIC ST PO BOX 248 ROCKLAND ME 04841-0248
    F FOR:ROBERT S KEEFER, JR                  PL           RTND   02/05/2003




              Enter Option: A=Add, B+Sel=Browse, M=More, R+Sel=RltnEdit:

Select the EXIT KEY for page selection line.

STATE OF MAINE

KNOX, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. RE-05-00A1NE

Knox. S.S., Clerks Office
SUPERIOR COURT

APR 1 3 2005

RECEIVED AND FILED
Susan Guillette, Clerk

ROBERT S. KEEFER, JR.,
as Personal Representative
of the Estate of
Robert S. Keefer, Sr.,

Plaintiff

v.

JOHN W. KEEFER,

Defendant

DECISION AND ORDER
(Title to Real Estate is Involved)

## I.    Introduction.

In this case, Robert S. Keefer, Jr. has brought a two-count amended complaint against his son, John W. Keefer, by which he seeks an order imposing a constructive trust on property in Camden, titled to him and his son, for the benefit of his father's estate.

Specifically, in count I of the amended complaint, the plaintiff[1] alleges that his father, Robert S. Keefer, Sr. and his son, John W. Keefer, entered into an agreement by which the latter agreed to hold record title to property in Malibu, California, as the former's nominee. The plaintiff says the defendant was paid for this service and that his father paid for the expenses relating to this property such as taxes, insurance and maintenance.

---

[1] Robert S. Keefer, Jr. was originally a plaintiff in his individual capacity and the text of the amended complaint reflects his personal claim. Summary judgment, however, was entered against him in his personal capacity so the only plaintiff left is the Estate of Robert S. Keefer, Sr., for whom Robert S. Keefer, Jr. is the personal representative. Accordingly, this decision and order, when it refers to the plaintiff, it is referring to Robert S. Keefer, Jr. but in his role as the personal representative of his father's estate.

Further, according to the plaintiff, the defendant, acting at the direction of the plaintiff and his father, exchanged the Malibu property for property in Camden, Maine. Because, however, the proceeds from the sale of the Malibu property were insufficient to complete the purchase of the Camden property, the plaintiff says he provided the sums needed and took title to an undivided interest in the Camden property.

Thereafter, the plaintiff alleges that he and his father instructed the defendant to transfer record title to the Camden property to the plaintiff, but he refused to do so.

The plaintiff claims that the defendant is not the beneficial owner of the Camden property and his failure to transfer it to the plaintiff, as personal representative of his father's estate, "is wrongful and constitutes a breach of a confidential and fiduciary relationship." Amended Complaint, ¶ 9. Accordingly, the plaintiff asks this court to impose a constructive trust on the Camden property and order it conveyed to the plaintiff.

Count II of the amended complaint is similar to count I. It alleges that John W. Keefer holds an 89.27% undivided interest in the Camden property but asks the court to declare that he holds the property as nominee for Robert S. Keefer, Sr. and order him to convey it to the estate of Robert S. Keefer, Sr.

For his part, John W. Keefer presents a counterclaim which was amended at trial. There he alleges that he and his father cannot resolve their differences concerning the Camden property and therefore asks the court to partition the property and order its sale either pursuant to 14 M.R.S.A. § 6501 or via the common law remedy of equitable partition.

The case was tried without a jury on March 28, 29, 30 and April 1, 2005, and is now in order for disposition.

## II.    Facts.

Based on the testimony adduced, and the court's evaluation of the credibility of the witnesses, and after an examination of the exhibits admitted at trial, the court makes the following findings of fact:

Robert S. Keefer, Sr. ("Senior" or "Stuart") was the father of Robert S. Keefer, Jr. ("Junior" or "Bob"). The latter was the father of the defendant John W. Keefer ("John") and his brother, Robert S. Keefer, III ("Robbie"). Accordingly, Senior was the grandfather of John and Robbie.

Junior divorced the mother of his two sons and married Dee Mattox ("Dee" or "Mattox"). The two moved to California in 1974 after their marriage. There they bought the property at Broad Beach, Malibu, which is the subject of this litigation. They also bought other property in California, including other parcels in Malibu, a portion of an apartment building, and three parcels in Palm Springs.

The Broad Beach property was financed in part by Junior's mother Jean W. Keefer, and initially titled in Junior's name. In return for her financing, Jean Keefer received a secured interest in the property in the form of a trust which was secondary to a first mortgage to a bank. The property was purchased for just under $100,000.

Approximately six months after the Broad Beach property was purchased, or in 1977, Junior conveyed his interest to Dee by quitclaim deed. The ostensible reason for this transfer was to assist Dee in her career in real estate because at the time she was pursuing a real estate license. After this conveyance, only Dee Mattox had title to this property in Malibu.

Sometime thereafter, Junior purchased an interest in Vive Nuger Hydraulics, a company which produced hydraulic presses. Ultimately, he became the sole owner of

the company, but its success was sporadic and it carried significant debt which was personally guaranteed by Junior and Dee.

As had been Senior's practice over the years, he assisted Junior with his business problems. He paid off a large company debt to Gulf and Western, and extended money to the company for which he was given security liens on its equipment. Eventually the business was sold, but significant company debts remained for which Junior was responsible via his personal guarantees. These resulted in liens on the Malibu property.

In the mid-1980's, Junior commenced divorce proceedings against Dee which were complicated by their ownership of various properties in California and the liens and encumbrances against them, particularly the property at Broad Beach, Malibu. During this time, Senior had been making mortgage payments on this property for his son and Dee while he also held liens on the property which he had purchased from other creditors.

By 1995, Junior was living at the Broad Beach property and Dee had moved out. Nevertheless, the property was titled to Dee and it was decided that Senior would foreclose his mortgage and other interests on the property, including deeds of trust, as a tactic in the pending divorce in order to recover the property for the Keefer family, and to terminate Dee's interest in it. Attorney Thomas Cairns, Jr., who was Junior's divorce lawyer, also represented Senior in this cooperative effort between father and son to gain advantage for the latter in this domestic litigation. Indeed, Cairns assisted Senior in acquiring the notes secured by the Broad Beach property as his client wanted the divorce to be over and was determined to enforce his rights as a beneficiary under several deeds of trust or as a mortgagee.

As a result of Cairns' and Senior's efforts, Dee sought to enjoin Senior's foreclosure action and he became a party to the divorce proceedings. As a result, Senior

did not complete the foreclosure process. Nevertheless, Senior's participation in the divorce case served as a catalyst to effectuate a settlement of all three parties' interests, Senior's, Junior's and Dee's.

Originally, the settlement plan as to the Broad Beach property would have had Dee convey the property to Senior in lieu of foreclosure but Senior did not want his name on the title because of a previous incident in which a lien was placed on his Florida property by the IRS who had confused his name with Junior's.

Consideration was also given to having the property conveyed to the Jean W. Keefer Trust,[2] but that idea, too, was rejected.

As a third plan, Senior wanted to have John and/or Robbie go on the title to the Broad Beach property. Although it is unclear from the testimony which grandson was approached first, Robbie rejected the opportunity, but John accepted it. In any case, Senior and Cairns decided that the former or his nominee, namely John, would be the party named on the deed to the Broad Beach property as part of the settlement between Senior and Dee. Accordingly, Cairns spoke with John and the latter agreed that he would serve in the capacity of nominee for his grandfather and father when the Broad Beach property was transferred and in order to consummate the divorce settlement. At the time, John's only concern was the potential of any adverse tax consequences to him of this conveyance.

After John agreed to serve as Senior's nominee, Junior told him that Senior would pay the taxes and insurance on the property and any mortgage payments. He also told him he would be compensated for holding the property for Senior.

---

[2] Jean Keefer had died before these events in 1995.

These discussions and agreements took place between November of 1995 and February of 1996. In the meantime, Junior had moved to Palm Beach, Florida, while his father lived in Vero Beach, Florida, approximately 80 miles away.

On February 14 and February 20, 1996, Senior and Dee, respectively, signed their settlement agreement with the latter date being its effective date. The agreement recited that it was made concurrently with the separate marital agreement between Junior and Dee. It also provided that, based upon the divorce settlement, "it is now appropriate for Mattox to return the Broad Beach property to Keefer, Sr., or his nominee, and... Mattox agrees to do so as set forth hereinafter." Pl.'s exh. 13, p. 2, ¶ 4.

The conveyance by Mattox of the Broad Beach property, however, was conditioned on the execution of the divorce settlement and Junior's obligation to pay Mattox $140,000 as part of the distribution of the couple's property, a sum which was paid by Senior.

As Senior had desired, however, he would maintain liens on the property as he wished to control it. The property would also remain encumbered by a lien held by Coast Federal Trust.

Finally, the agreement contained a paragraph which recited that, "This Agreement is entire and includes all representations of every kind of (sic) nature made by each of the parties to the other. This Agreement may not be altered, amended or modified except by an instrument in writing executed by both parties hereto." Pl.'s exh. 13, p. 4, ¶ 10. The divorce agreement contained an identical provision.

On February 20, 1996, the same day as the effective date of Mattox's agreement with Senior, and consistent with its terms, Dee conveyed the Malibu property to John. The deed accomplishing the transfer is stamped, "Bonafide Gift" and bears handwriting which recites, "No consideration interfamily transfer." This deed, which was prepared

by attorney Cairns, also has an instruction on this form to mail the deed when it is recorded and the tax statement to R. Stuart Keefer, Sr. at his address in Vero Beach. Accordingly, John never got the original deed.

The result of this settlement and conveyance was to have the title to the Malibu property go to John. This was consistent with Senior's intent expressed to his attorney that the property would be held for the benefit of Junior who had returned to live at the Malibu house in May of 1996, and that John would serve as "a legal titleholder or really a straw man... to hold legal title to the property." Cairns dep., p. 87, lines 12-18.

As part of the divorce settlement, in addition to the Malibu property, Dee also received the couple's property in Santa Monica and Junior received their property in Palm Springs.

In July of 1996, a hearing on the divorce petition was conducted and the divorce judgment, which incorporated the parties' agreement, was filed on August 12, 1996.

That autumn, consistent with Senior's wishes, John and Junior listed the Malibu property for sale with a broker selected by Junior. John signed the original listing agreement, but when that listing agreement expired, Junior renewed it by signing John's name to it. The property was listed for $725,000.

On January 27, 1997, Junior quitclaimed his interest in the Malibu property to John. He did this because the title company requested it and because it was important to keep Junior's name off this property because of his financial troubles. According to Junior, this was not a gift to John because he had no interest to give because he had conveyed all his interest in the property to Dee years before. Nevertheless, the deed bears the same stamp as had the deed from Dee to John, namely, "Bonafide gift" and "No consideration/Interfamily."

On March 5, 1997, the deeds from Dee to John, and from Junior to John, were recorded at the Recorder's Office in Los Angeles.

Although later John provided labor and effort to improve the Malibu property, he never paid Senior, Junior or Dee for his interest in this property.

On August 13, 1997, Junior filed for Chapter 7 bankruptcy projection. He did not list the Malibu property as an asset, but did list his property in Palm Springs and the lien held by Senior on this property.

On November 22, 1997, Senior wrote to John telling him to correspond with Coast Federal Bank, which held a mortgage on the Malibu property, and tell the bank that he, John, is the owner and that all correspondence should be directed to him. Senior also wrote that he has made the mortgage payments in 1997, will make the payment for December, and "that I am willing to pay the mortgage interest, up to the date the property is sold but not more than six months." Def.'s exh. 30.

John interprets this letter to be advice from his grandfather that he, John, needs to be prepared to take over the mortgage and will be taking responsibility for the property. In the court's view, however, this letter reflects Senior's impatience with holding and paying for his property and that he wanted it sold.

John did not sell the property within six months as instructed, and Senior continued to service the mortgage and paid all the taxes.

Ultimately, Junior was discharged in bankruptcy and Senior reiterated his wish that the Malibu property be sold.

Sometime in late 1999 or early 2000, it was suggested to Junior that the Malibu property could be exchanged for other property tax free via section 1031 of the Internal Revenue Code. Accordingly, Junior, who believed the Malibu property would ultimately become his by a transfer from John, began looking for property on the East

Coast for which he could exchange the Malibu property. He found what he was looking for in Camden in a house owned by Richard and Denise Gilliam and located on Chestnut Street in that town.

According to Junior, John was cool to this idea because he did not favor Maine but agreed to this like-kind exchange for the property in Malibu. John testified that he agreed to the exchange because he was living in Santa Monica and would not lose anything by this transaction because it required an exchange for property of equal or greater value.

Thus, once a buyer for the Malibu property had been secured, the proceeds from the sale of that property were used to purchase the Camden property. Because, however, this sum was inadequate to fully meet the price of the Camden property, Junior contributed $100,000 to its purchase. As a result, the title to the Maine property shows that John has an 89.27% interest, reflecting the sum netted from the Malibu sale invested in the property, and Junior has a 10.73% interest, reflecting his $100,000 contribution to the property's purchase.

Before the like-kind exchange occurred, Senior caused the liens and the debts associated with the Malibu property to be discharged.

Since the purchase of the Camden property, Junior and his female companion have made significant improvements in the property. They have also lived there from June to November each year since 2001. John has made no investments in this property and has never visited it. According to Junior, the fair market value of this property today is $1.3 to $1.5 million.

At a time near to the like-kind exchange or thereafter, John approached Junior and asked him to speak with Senior about loaning him $40,000 which he needed for the

property in Santa Monica. Junior instructed him to write Senior directly and offered to discuss the letter with him.

During this same time period, Junior asked John to transfer his interest in the Camden property to him and would pay him for doing so. John replied that Junior owed him money for taking on the Malibu property and that he needed it to purchase a house. Senior and Junior did discuss John's letter and Senior replied on August 5, 2000. There he told his grandson that he would be willing to give him $20,000 which would be deducted from his inheritance and wrote, "I want you to take the necessary steps to transfer the Malibu property to your father . . . The title should bear the name of your father as the owner." Pl.'s exh. 63.[3]

John did not obey these instructions and in an apparent effort to satisfy John's demands for the promised compensation to hold the Malibu property and to encourage cooperation with the proposed transfer of the Camden property, Junior gave him $10,000 in April, 2001 and the same sum in December, 2001.

During this time, John continued to decline to effectuate a transfer of his interests in the Maine property, expressing concerns for the tax consequences of such a transaction.

Apparently Senior learned of his grandson's lack of cooperation and wrote him a typed letter on May 23, 2002. The letter asks that John transfer the Maine property to the Jean W. Keefer Trust and telling him that the Maine property was never intended as a gift to him.

---

[3] At trial, John disputed the authenticity of this letter suggesting that Junior had it prepared and caused his grandfather to sign it. The court rejects this contention and concludes that the letter was authored and signed by Senior. In this regard, the court finds the deposition testimony of Gigi Beasley that she assisted Senior with this letter to be credible and that his mistaken reference to the Malibu property instead of the Maine property was the likely product of a man who was then 97 years old.

John told Junior that he did not think Senior had written this letter and Junior told Senior this. As an apparent answer to this concern, Senior sent John a handwritten letter on June 3, 2002, telling him, in part, "I am asking you now to transfer the Maine property to the J.W.K. Trust." Pl.'s exh. 65.

John visited his grandfather each year at either his college spring break or on the latter's birthday including the years 1996 through 2002. Robbie visited as often as twice a year when he was living in Florida and later once a year at Senior's birthday.

According to Robbie, he and John were treated alike by Senior and each of them got $10,000 each Christmas for four Christmases, but this was reduced to $5,000 in 2001 and then nothing in 2002.

Pursuant to his estate plan, Senior had established a trust which was to make cash gifts on his death. By an amendment to that trust, dated April 28, 1998, Robbie, John and his attendant, Gigi Beasley, were to be given $50,000 each. On March 17, 2003, Senior amended his trust again and eliminated the gift provisions for John and Robbie.

Senior died on May 10, 2003. Junior is his sole heir, but the estate has been left "open" pending resolution of this case.

Even though Senior relied on the assistance of Junior in his financial affairs during the last year of his life, the court finds the testimony of Gigi Beasley and Todd Fennell, Senior's estate planning attorney, to be persuasive so that there is no reason to doubt Senior's competence to oversee his affairs and the plan for the disposition of his property before and after his death. Moreover, the court has no basis to find that Junior exercised undue influence over his father's actions and decision-making in this regard.

From all this, the court finds that the plaintiff's version of what transpired among the parties is the correct one. That is, Senior arranged to implement a divorce settlement between Junior and Dee which included his settlement with her resulting in

her conveyance of the Malibu property to him or his nominee.[4] Senior selected John to be his nominee and the latter acceded to Senior's and Junior's plans for the property and was compensated for doing so. Once he had title, however, he did not obey Senior's instructions as his principal to convey either the Malibu or Camden properties to Junior or the Jean W. Keefer Trust.

The court's factfinding supports this conclusion as do the following inferences which the court has drawn from these findings:

The court finds the testimony of attorney Cairns credible that Senior's intent in entering into the settlement agreement was that he would "take" the property but that John would be his nominee. The court also accepts as true his testimony that he called John about this plan and the latter agreed to serve in the capacity contemplated. Further, Cairns' role in drafting the deed from Mattox to John including, it may be inferred, the provision that the original was to be sent to Senior, supports the conclusion that this was a transaction orchestrated by Senior as he would have it carried out.

John also did not treat the Malibu property as though it were his. True, he lived in the property for a while and did provide labor for its improvements. But, for most of the time after he was deeded this property he lived in Santa Monica where he was working to buy another house. In the meantime, his father lived in the Malibu house and treated it as his own.

John also spent no money on the Malibu property and accepted Senior's payment of all overhead expenses. Moreover, the fact that John wanted to be paid and was compensated for "holding" the Malibu property confirms that he understood that he was not its true owner.

---

[4] The court applies here the same definition of "nominee" as it did in its Decision and Order of June 25, 2004, pp. 11-12, when acting on the defendant's motion for summary judgment.

Moreover, the fact that John wanted money from Senior and Junior to buy or improve property in Santa Monica shows that his interest was there and not in cultivating or using property in Malibu, even though, ostensibly, he owned it. Indeed, if John had believed he owned the Malibu property as an outright gift from Dee or Senior, he could have sold it and grossed approximately $700,000 which would have eliminated any need to ask for much smaller sums from Senior and Junior to accommodate his property plans in Santa Monica. Instead, because he knew he was Senior's nominee, he knew he was not free to sell the Malibu property and retain the proceeds. Rather, he was instructed to sell the property and initially cooperated in this endeavor with Senior and Junior as to the sale of the Malibu property.

John's role in the like-kind exchange for the Camden property also supports the conclusion that he understood that he was merely a straw man as to both properties. He had no role in selecting the property for which the Malibu property would be exchanged. Because he "owned" the Malibu property, not only could he have vetoed this transaction, had he agreed to it he would have had full authority to select the new property as he would be its owner with all the privileges and responsibilities that accompany such a transaction. Instead, even though he had little interest in Maine, and had not seen the Camden property, he agreed to the sale of "his" property in California and the acceptance of a diluted interest in property across the country. Indeed, he understood that Maine is where Junior wanted to be and acceded, albeit grudgingly, in this transaction because he knew he was not the true owner of the Malibu property and was duty-bound to follow instructions as to its disposition. Thus, John's explanation that he was satisfied with the like-kind exchange because he would be getting property of equal or greater value rings hollow.

While all three men in this dispute are intelligent, capable people, there is no doubt that Senior was the dominant player and that he favored his son in every instance. He was a man of considerable business acumen and wealth. He "bailed out" Junior from his business errors and arranged to pay off his multiple debts while assisting in the financing of his lifestyle. While some parents might grow weary or bitter over the lack of care shown by a child for financial management, Senior advocated for Junior up until the last year of his life and left his estate to him.

By contrast, while Senior was generous to his grandsons, when he learned that John was disobeying his instructions as to the transfer of the Malibu and Maine properties, he reduced and then eliminated any bequests to John, and gave similar treatment to Robbie who had declined to assist in that portion of the settlement agreement with Dee which would have him hold the Malibu property.

All of this shows that Senior intended to benefit Junior in these affairs and that the Malibu/Camden property was eventually to become Junior's either by John acceding to Senior's request to convey it to him or its return to Senior or his wife's trust which would result in Junior's obtaining the property by inheritance.

The evidence, as here interpreted, also supports the conclusion that John knew he was to serve as Senior's nominee in the disposition of the Malibu/Maine properties and treated the transactions and the properties accordingly except when it came time to transfer the properties as their principal directed.

III.    Law.

A.    Application of Parole Evidence Rule.

Via his motion in limine and pretrial memorandum, John cites the parole evidence rule as a basis to exclude from the court's consideration any agreement between Senior and John as to the latter serving as Senior's nominee to take title to the

Malibu property. In this regard, it is the court's understanding that the defendant objects to the testimony of Thomas Cairns and various documents which would show that Senior intended that John serve in this capacity and that the latter agreed to this role.

Assuming that the parole evidence applies in this case, the defendant is correct that California law would apply as it was there that the agreement in question was entered into over land situated in that State. While California undoubtedly benefits from a rich body of law on this topic, the defendant has cited only one case from that State concerning parole evidence. *See Esbensen v. Userware International, Inc., et al.,* 11 Cap. App. 4th 631, 637 (1992).

While that case is useful, the court will decline to undertake a thorough research of California law and will, instead, rely on the RESTATEMENT (SECOND) OF CONTRACTS for guidance because it is nationally recognized as an authoritative source on contract law including, it may be presumed, the parole evidence rule.

To begin with, the court views the written agreement between Senior and Dee and Dee and Junior and the deed from Dee to John as one, unitary agreement. That is because the agreement between Senior and Dee recites that it is concurrently executed with the divorce settlement agreement between Dee and Junior and it is plain that the two are related and consistent with each other. By similar reasoning, the deed from Dee to John was also executed on this occasion and was unquestionably designed to carry out the other two agreements. That is, Junior and Dee agreed that the Malibu property would be set aside to her as her separate property and the related, concurrent agreement between her and Senior provided that she would convey that property to him "or his nominee." These agreements were fulfilled when, consistent with their terms, Dee, as titleholder to the Malibu property by virtue of the 1977 quitclaim deed

and the divorce settlement, conveyed the property to Senior or his nominee. No one has suggested that Dee violated her covenants with Senior or Junior, so the only possible conclusion from the face of these three documents is that Dee conveyed the property to Senior's nominee, John Keefer. That is because, as noted, the property was not conveyed to Senior, so that it must be concluded that it was conveyed to John as his nominee. That being the logical and factual construction of these interrelated documents, there is no ambiguity in them and John must be seen as Senior's nominee. Accordingly, there would be no need to turn to evidence outside these agreements to establish that John, as Dee's grantee to the Malibu property, was serving as his grandfather's nominee in taking title to that property.

Assuming, however, that this construction of the parties' agreements needs expansion or explanation, we may turn to the parole evidence rule. The rule, as expressed by the Restatement, is recited, in part, as follows:

> (1)   A binding integrated agreement discharges prior agreements to the extent that it is inconsistent with them.
> (2)   A binding completely integrated agreement discharges prior agreements to the extent that they are within its scope.

RESTATEMENT (SECOND) OF CONTRACTS § 213 (1981).

Applying these two precepts to this case, the court, as discussed infra, would conclude that the three agreements cited are one binding and completely integrated agreement. Accordingly, they would discharge any other prior agreement within its scope. However, because the only other prior agreement within its scope is the oral agreement between Cairns, Senior's attorney, and John to serve as Senior's nominee, which is fully consistent with the integrated agreement, there is no need to "discharge" that agreement.

If, however, the court has erred in this interpretation of this unitary agreement and it is not completely integrated, it would only discharge an agreement that is inconsistent with its terms. Because the court has concluded that the agreement between Senior's attorney and John is not inconsistent with the terms of the agreement, then it is not discharged and may be considered part of this agreement.

If this second interpretation is correct, then, as the Restatement teaches, "[t]he existence of the prior agreement [between Senior's attorney and John] may be a circumstance which sheds light on the meaning of the integrated agreement, but the integrated agreement must be given a meaning to which its language is reasonably susceptible when read in light of all the circumstances." *Id.* comment b. So, because the agreement between Senior's representative and John sheds light on and does not detract from the meaning of the integrated agreement, it is a circumstance which may be considered in the interpretation of the latter agreement.

Said differently, if the oral agreement between Cairns and John contradicted the partially integrated agreement, it would be excluded under the rule. *See id.* § 209, illustration 3. And, if the contract is fully integrated, the oral agreement is also excluded. *Id.* However, because the court has found that the contract is completely integrated and can only be interpreted as designating John as Senior's nominee on the deed, Cairns' testimony as to the agreement with John is excluded under the rule but is unnecessary to prove that he is the nominee. But, as discussed infra, if the agreement is partially integrated because the agreement between Cairns and John is not inconsistent with its terms, it may be considered under the parole evidence rule.

In the end, then, the court concludes that the construction of the contract, or the evidence extrinsic to it, shows that John was Senior's nominee and held the Malibu property for him and the parole evidence does not interfere with that conclusion.

Before leaving this topic, it is worth addressing the defendant's parole evidence argument as to the other two deeds. First, the quitclaim deed from Junior to John has little bearing in this debate. It is a fully integrated contract in which Junior surrendered any claims he personally had to the Malibu property. He had already done so 20 years earlier and neither document or anything said about them would deprive him of his standing to recover the property on behalf of his father's estate.

A similar conclusion can be made as to the Camden like-kind exchange transaction. Because the court here concludes that the parole evidence rule does not serve to interfere with the conclusion that John was Senior's nominee in holding the Malibu property, he therefore had the same role vis-à-vis the Camden property when he exchanged the former for the latter. That is to say, when John exchanged the Malibu property in April of 2000, he did so as Senior's nominee and his role as to his principal was not extinguished. That he participated in this transaction at Junior's behest does not change this conclusion.

Nor would the parole evidence rule bar this finding. Assuming that the like-kind exchange transaction is fully integrated, although it does not so recite, John's role in this matter, as noted, was as his grandfather's nominee and it is unnecessary to inquire further as to this status. If, however, this agreement was not completely integrated, John's oral agreement to participate does not contradict the agreement and by virtue of the rationale offered herein, is admissible to establish his role in this transaction.

In sum, the application of the parole evidence rule does not serve to vitiate John's role as Senior's nominee in the transactions at issue.

## B.     Constructive Trust.

The defendant argues that even if the factual disputes are resolved in the plaintiff's favor, the latter cannot establish by clear and convincing evidence the breach of a confidential relationship which might yield the imposition of a constructive trust.

For this proposition, he cites the court to the case of *Estate of Campbell*, 1997 ME 212, ¶ 8; 704 A.2d 329, 331, where the Law Court held that a claim for a constructive trust may be maintained "on the *independent* basis of an abuse of a confidential relationship..." *Id.* (emphasis supplied). In order to show the abuse of a confidential relationship, the party seeking the imposition of the trust must show the actual placing of trust and confidence by one party in another "*and* a great disparity of position and influence between the parties to the relation." *Id.* (quoting *Ruebsamen v. Maddocks*, 340 A.2d 31, 35 (Me. 1975) (emphasis supplied)).

While the existence of a family relationship may suffice to establish a confidential relationship, *id.*, "a finding of great disparity of position and influence remains a necessary prerequisite to a determination that a confidential relationship exists, even where the parties are related." *Estate of Sylvester v. Benjamin*, 2001 ME 48, ¶ 8, 767 A.2d 297, 300. Moreover, a constructive trust may be imposed when title to property is acquired by fraud, duress or undue influence. *Gaulin v. Jones*, 481 A.2d 166, 168 (Me. 1984).

The court concurs with the defendant that the plaintiff has not established that John obtained title to the Malibu or Camden properties by virtue of great disparity of position and influence between him and his grandfather. Indeed, the evidence would show that it was Senior who held the dominant position in the family and had sway over its members, including John. It is also true that there is no evidence of duress or

undue influence imposed by John on Senior. Accordingly, a constructive trust may not be imposed on these bases.

> The alternative basis for a finding of a constructive trust exists where, in making the conveyance, the grantor trusts the grantee to hold the property for the benefit of the grantor or a third party. In such situations, the grantee abuses the resulting fiduciary relationship if he fails to perform, and he will then be treated by the court as a constructive trustee for the beneficiary.

*Id.* at 169.

So, in a situation where the transferor acts in "reliance on a relationship of trust which may be founded on moral, social, or personal, as well as legal duties," *id.*, and that relationship is abused by the wrongful disposition of the property, a constructive trust may be imposed. In such a case, which is independent of a constructive trust based on the breach of a confidential relationship, the constructive trust "arises by operation of equity without regard to the parties' intentions. Its objective is to prevent unjust enrichment." *Estate of Campbell*, 1997 ME 212, ¶ 5, 704 A.2d at 331 (quoting Horton & McGehee, *Maine Civil Remedies* § 9-3 at 221 (2nd Ed. 1996)).

These principles were applied in the case of *Baizley v. Baizley*, 1999 ME 115, 734 A.2d 1117 which bears some resemblance to the case at bar in that there the defendant promised the grantor of property conveyed to him that he would share the property with his siblings, but then reneged. In that case there was no evidence of disparity of position and influence or of duress, but the Law Court found that a constructive trust could be imposed based on these facts which amount to a constructive fraud.

While the facts in the case at bar differ from those in *Baizley* and *Gaulin*, they bear the same essential elements. That is, the plaintiff has proven by clear and convincing evidence that a party, Senior, caused property over which he had control to be conveyed to another, John, based on the latter's agreement to serve as his nominee, but

the latter reneged on his agreement and has sought to keep the property or its substitute for himself while retaining the other benefits of that agreement. The court finds, also by the requisite standard of proof, that this amounts to a constructive fraud as it abused a relationship between grandson and grandfather which was founded on "moral, social, personal, ... [or] legal duties." *Gaulin,* 481 A.2d at 169. Accordingly, the court also concludes that this has resulted in unjust enrichment to John who retained the property although he was a fiduciary to his grandfather which must be remedied by the imposition of a constructive trust.

Because the court so concludes, and because the resolution of the other legal issues in this case at trial and in this decision support a disposition in favor of the plaintiff, judgment will be entered for Senior's estate as hereinafter expressed.

Thus, the court concludes that a constructive trust must be imposed on John's 89.27% interest in the property in Camden in favor of the Estate of Robert S. Keefer, Sr. for which he has held that property as the nominee of the deceased. As articulated by the plaintiff in his proposed abstract, Junior's interest of 10.73% in this property is unaffected by this decision.

## V.      Conclusion.

For the reasons stated herein, the clerk is DIRECTED to enter judgment for the plaintiff as follows:

> Count I. A constructive trust is impressed on the 89.27% undivided interest of the defendant, John W. Keefer, in the property described in attachment A hereto for the benefit of the plaintiff, the Estate of Robert S. Keefer, Sr.

> The interest of Robert S. Keefer, Jr. in said property is unaffected by this judgment.

> Count II.    The court FINDS and DECLARES that defendant John W. Keefer is holding the property in Camden, Maine, as more

particularly described in attachment A hereto, as nominee for the Estate of Robert W. Keefer, Sr., the plaintiff herein.

Judgment for the plaintiff is entered on the defendant's counterclaim.

So ordered.

Dated: April_/1___, 2005

John R. Atwood
Justice, Superior Court

A certain lot or parcel of land, together with the buildings thereon, situated on Chestnut Street in Camden, Knox County, Maine, bounded and described as follows, to wit:

BEGINNING at a granite marker at the corner of a stone wall near the junction of Chestnut Street and Penobscot Avenue; thence North 74 deg. 03 min. 48 sec. East along said stone wall and following southerly line of said Penobscot Avenue one hundred ninety and eighty one-hundredths (190.80) feet to an angle in said stone wall; thence North 63 deg. 40 min. 52 sec. East along said stone wall and still following southerly line of said Penobscot Avenue ten and fifty-nine one-hundredths (10.59) feet to a concrete marker; thence North 63 deg. 40 min. 52 sec. East along said stone wall and still following southerly line of said Penobscot Avenue one hundred twenty-five (125) feet to a concrete marker for a corner; thence South 25 deg. 20 min. 30 sec. East along the line of land of Miller, now or formerly, one hundred ninety-six and ninety-four one-hundredths (196.94) feet to a granite marker; thence South 06 deg. 03 min. 59 sec. West along line of Miller seventy-two and forty-five one-hundredths (72.45) feet to a concrete marker; thence continuing on the same course along line of land of Miller, now or formerly, and then of Currie, now or formerly, two hundred six and seventy-eight one-hundredths (206.78) feet to a granite marker for a corner in the northerly line of Beacon Avenue; thence South 89 deg. 29 min. 52 sec. West following northerly line of said Beacon Avenue ninety-nine and fifty-seven one-hundredths (99.57) feet to a granite marker at an angle; thence South 89 deg. 10 min. 40 sec. West along a stonewall and still following northerly line of said Beacon Avenue twenty-five and forty-three one-hundredths (25.43) feet to a concrete marker; thence continuing on same course along said stone wall and still following northerly line of said Beacon Avenue two hundred fifty-eight and seventy-one one-hundredths (258.71) feet to the corner of said stone wall at the intersection of the northerly line of said Beacon Avenue and the easterly line of said Chestnut Street; thence North 02 deg. 39 min. 23 sec. East along a stone wall and following easterly line of said Chestnut Street one hundred sixty-five and thirty-seven one-hundredths (165.37) feet to a granite marker at an angle; thence North 05 deg. 04 min. 06 sec. East along said stone wall and still following easterly line of said Chestnut Street one hundred eighty-three and sixty-two one-hundredths (183.62) feet to the granite marker at the place of beginning.

For reference, see Plan of Subdivision of Land of Angeline T. Ferris, surveyed by J. S. McCormick & Associates, Inc., October 1973, unrecorded.

The above parcel being comprised of land recorded at Knox County Registry of Deeds at the following Books and Pages:     119 - 35; 120 - 173; 122 - 446; 127 - 454; 168 - 71, 211 - 575; 265 - 396; 146 - 86; 260 - 182; 291 - 524; 247 - 542; 228 -238.

Excepting therefrom the premises conveyed by Helen Taylor to Josephine H. Jinno by deed dated May 15, 1947, and recorded at the said Registry in Book 296, Page 509.

ROBERT S KEEFER JR V. JOHN W KEEFER
UTN:AOCSsr  -2003-0011500              CASE #:ROCSC-RE-2003-00001
-------------------------------------------------------------------------
SEL VD                        REPRESENTATION TYPE        DATE
01 0000003232 ATTORNEY:PERKINS, DAVID
ADDR:30 MILK STREET PO BOX 449 PORTLAND ME 04112-0449
    F FOR:JOHN W KEEFER                      DEF        RTND   02/26/2003


02 0000000437 ATTORNEY:WATKINSON, RANDAL
ADDR:10 MASONIC ST PO BOX 248 ROCKLAND ME 04841-0248
    F FOR:ROBERT S KEEFER, JR                PL         RTND   02/05/2003




        Enter Option: A=Add, B+Sel=Browse, M=More, R+Sel=RltnEdit:

Select the EXIT KEY for page selection line.